**John D. HUDSON, Plaintiff–Appellant,**

v.

**SOUTHERN DUCTILE CASTING CORP., Defendant–Appellee.**

No. 87–7261.

United States Court of Appeals, Eleventh Circuit.

July 20, 1988.

Henry L. Penick, Penick, Williams & Jones, Birmingham, Ala., for plaintiff-appellant.

James W. May, Bradley, Arant, Rose & White, Stephen E. Brown, Birmingham, Ala., for defendant-appellee.

Before JOHNSON, Circuit Judge, HENDERSON *, Senior Circuit Judge, and PITTMAN **, Senior District Judge.

PER CURIAM:

John D. Hudson appeals from an order entered by the United States District Court for the Northern District of Alabama granting summary judgment in favor of the Southern Ductile Casting Corporation ("Southern Ductile"). We affirm.

This case began when Hudson, a fifty-eight-year-old black male, filed a complaint against Southern Ductile, his former employer, in the district court, alleging violations of (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (2) the Civil Rights Act of 1866, 42 U.S.C. § 1981; and (3) the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Hudson was employed by Southern Ductile from November 11, 1946 until July 2, 1985. During his employment, he held a variety of jobs including core-room foreman, the position he held on the date of his termination, at the company's foundry in Bessemer, Alabama.

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

In the late 1970s, Southern Ductile began a program of expansion and modernization at its Bessemer facility. These improvements included additions of equipment and processes and the construction of a new plant building, permitting Southern Ductile to expand its space allotted for coremaking. In January, 1982, Southern Ductile hired Charles Hardin, a twenty-seven-year-old white male with a degree in engineering, as general coreroom foreman, a newly created supervisory position. Hardin's duties as general coreroom foreman included managing the expanded coreroom operations and providing problem-solving/trouble-shooting skills in the startup of the new equipment and processes in the new plant. Both Hudson, as first shift coreroom foreman, and Donald Shierling, a thirty-one-year-old white male, as second shift coreroom foreman, reported to Hardin who, in turn, was responsible to Mike Widick, the operations manager. Prior to the creation of the general coreroom foreman position, Hudson and Shierling had reported directly to Widick.

Hardin resigned from the company after about ten months and was replaced by George Whitlow, another white male who was transferred from his position as general foundry foreman. Hudson characterizes Southern Ductile's failure to promote him to general coreroom foreman on these two occasions as acts of discrimination.[1]

Although Hudson worked primarily in the coreroom, he received several temporary assignments during the period relevant to this lawsuit. For a portion of 1982, he served as a plant guard and from late November, 1984 until May, 1985, approximately one month before he was terminated, he served as the second shift grinding room foreman. These temporary transfers, according to Hudson, were demotions and were motivated by discrimination.[2]

In late June, 1985, Southern Ductile eliminated several jobs as part of an alleged reduction in force ("RIF"). The employees and positions terminated in the RIF were (1) James W. Hill, a white, thirty-six-year-old personnel manager; (2) John E. Moore, a white, thirty-six-year-old industrial engineer/technician; (3) George Davis, a black, thirty-four-year-old first shift gatebreaking foreman; (4) Harvey Prater, a white, fifty-nine-year-old second shift gatebreaking foreman; and (5) Hudson. A sixth employee, Thomas Haisten, a white, twenty-five-year-old foreman trainee, was allowed to return to an hourly position in the bargaining unit. Pursuant to a collective bargaining provision, Haisten was entitled to return to the bargaining unit and to retain his seniority because he had been classified as a supervisor for less than six months. A seventh employee, Harry Burton, a white, sixty-four-year-old maintenance foreman, had lost his job a short time earlier as a result of reassignments following elimination of the position of plant engineer. Southern Ductile offered Hudson, Prater and Davis employment as hourly employees in the bargaining unit without seniority rights, because they were not eligible under the bargaining agreement, or, alternatively, a severance package providing insurance coverage for ninety days and one week's pay for each year worked. Prater and Davis accepted the severance package. Hudson rejected both options and was terminated. In the face of these facts in evidence, Hudson maintains that his discharge was motivated by discrimination.

On July 23, 1985, Hudson filed a discrimination charge with the local Equal Employment Opportunity Commission ("EEOC"). In addition to the foregoing, Hudson asserts that his termination resulted from unlawful retaliation because he consulted with the EEOC with respect to purported discriminatory employment practices and because his son, Stassonia Leon Hudson, filed a prior charge of employment discrim-

1. The district court held that Hudson's charge of discriminatory nonpromotion was limited to one of intentional racial discrimination under § 1981. The court ruled that any ADEA or Title VII cause of action regarding those events was precluded by Hudson's failure to file a timely charge with the EEOC. That determination is not challenged on appeal.

2. As noted by the district court, these claims are limited to charges of intentional racial discrimination under 42 U.S.C. § 1981. See n. 1 *supra.*

ination with the EEOC against Southern Ductile. On May 21, 1986, following receipt of a right-to-sue letter, Hudson filed this action in the district court. On March 17, 1987, the district court granted Southern Ductile's motion for summary judgment. This appeal followed.

■ Hudson urges that he should have been promoted over Hardin and Whitlow to the newly created position of general coreroom foreman in 1982. Southern Ductile asserts that Hudson was not offered the position because he lacked the technical and supervisory skills needed for the job. One of the most important functions associated with that job involved the calculation and revision of standards by which the company measured its efficiency and established the cost basis for its products. It is undisputed, however, that at the time Hardin was hired, Hudson did not know how to calculate the standards.[3] It is also without contradiction that around the time Whitlow and Hudson were being considered as replacements for Hardin, Whitlow himself tried several times unsuccessfully to teach Hudson how to calculate the standards properly. Although Hudson maintains that he subsequently learned this ability from another supervisor,[4] there is no evidence that he ever communicated this fact to the company or that the company's proffered reason for transferring Whitlow to the position of general coreroom foreman rather than Hudson was pretextual.

■ Hudson charges that he was "demoted" for several months in late 1982 when he was temporarily assigned as a plant guard. However, Hudson suffered no reduction in pay or loss of benefits as a result of this alleged demotion. It is also undisputed that several white supervisors, including Widick, were similarly assigned plant guard duties at that time.

Hudson also apparently complains about his assignment to the grinding room in late 1984 when Southern Ductile discontinued its second shift coreroom operations. Again, he suffered no reduction in pay or loss of benefits as a result thereof and was transferred back to the position of coreroom foreman, on the first shift, in May, 1985. As with the alleged demotion to plant guard, he produces no evidence, other than his own conclusory allegations, of racial discrimination.

■ The main force of the complaint charges that the discharge in July, 1985 was based on age and race discrimination. As a result of the RIF, seven supervisory and salaried positions were eliminated. Of the seven persons affected by these managerial reductions, five were white (Prater, Hill, Moore, Haisten and Burton) and four were under forty years of age (Davis, Hill, Moore and Haisten). The resulting changes in the racial and age composition of the salaried workforce were nominal.[5] As pointed out earlier, Hudson was offered a job in the bargaining unit in lieu of termination or a severance package. This same option was offered to Prater (white and over forty) and Davis (black and under forty). While none of the other affected employees were given the choice afforded Haisten of returning to the bargaining unit with retained seniority, it is undisputed that this different treatment is attributable to the fact that Haisten retained this right under the collective bargaining agreement. Based on the evidence and reasonable inferences therefrom, it is obvious to us that Hudson's claim of discrimination over his termination lacks factual support.

---

3. In his deposition, Hudson claims to have mastered the ability to calculate standards "after Charlie Hardin's time, during the time Charlie Hardin left or getting ready to go, right during that time." He further stated that Hardin "was working with me and learning me things I didn't know, you know, which I never would have needed but they were just going to learn me them things." [Sic].

4. There is reason to doubt this assertion in light of Hudson's wife's testimony that he "can read and he can write some, but not enough maybe to where somebody would understand it if he wrote it, you know, so everybody could read." [Sic].

5. The percentage of black salaried employees decreased from 15.6% to 12% while the percentage of salaried employees over forty years of age increased from 59% to 64%.

In a further effort to bolster his case, Hudson contends that he was "replaced" by a white man, Phil Allen. There is no evidence to support such an assertion. In his deposition, Hudson admits that Allen already served as leadman in the coreroom, not coreroom foreman, at the time Hudson was terminated and that Allen remained in that position afterwards. He also claims that Southern Ductile hired six white employees shortly after he was discharged. However, he does not allege the positions these employees assumed within the company or that any one of them took over his job as coreroom foreman. Hence, insofar as his termination is concerned, Hudson has failed to make out a prima facie case of race discrimination under Title VII or age discrimination. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609, 616 (1979).

 Finally, Hudson claims that he was discharged in retaliation for his threat several years earlier to go to the EEOC concerning his failure to be promoted to general coreroom foreman and because of an EEOC charge filed by his son, Stassonia. However, the evidence before the district court is uncontradicted that the only person to whom he claims to have related his threat, Mike Widick, had been discharged from Southern Ductile long before Hudson was fired and that the persons who made the decision to terminate Hudson were unaware of the alleged threat. Hudson admitted in his deposition that the only person threatened with dismissal as a result of his son's EEOC charge was Stassonia himself. The evidence clearly shows that Stassonia remains employed at Southern Ductile and that another of Hudson's sons, Lemuel, was hired by the company shortly after Hudson's discharge.

Although summary judgment should be granted with caution in employment discrimination cases, there are occasions when such disposition is appropriate. See, e.g., *Beard v. Annis*, 730 F.2d 741 (11th Cir.1984). This is one of those cases. Where, as here, full discovery has been conducted, the Supreme Court stated recently that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986) (citations omitted). See also *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We agree with the district court that the evidence in this case was such as to warrant summary judgment. Accordingly, the judgment of the district court is

AFFIRMED.