**UPPER CHATTAHOOCHEE RIVER-KEEPER FUND, INC., The Chattahoochee Riverkeeper, Inc., W. Robert Hancock, Jr., Jack Baytos, Troup County, The City of West Point, The City of LaGrange–Troup County Chamber of Commerce, Heard County, The City of Hogansville, Harris County, and The Lake Harding Association, Plaintiffs,**

v.

**The CITY OF ATLANTA, Defendant.**

**Civil Action No. 1:95–CV–2550–FMH.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 11, 1996.

David H. Pope, Carr, Tabb & Pope, Atlanta, GA, for Plaintiffs.

Richard Allen Horder, Newton G. Quantz, III, Kilpatrick & Stockton, Atlanta, GA, for Defendant.

Susan Barker Forsling, Susan Hartwig, Office of Fulton County Attorney, for Intervenor.

### ORDER

HULL, District Judge.

Plaintiffs bring this action against Defendant City of Atlanta ("the City") regarding, among other things, concentrations of phosphorus discharged into the Chattahoochee River. This matter is before the Court on the parties' Cross Motions for Partial Summary Judgment [26–1, 28–1] and Plaintiff Upper Chattahoochee Riverkeeper Fund, Inc.'s Motion for a Protective Order [53–1].

This Order narrowly addresses the discharge of phosphorus, which is only one of the many pollutants contained in the effluent discharged from the City's treatment plants into the Chattahoochee River and its tributaries. The City entered a consent order with the Environmental Protection Division of the State of Georgia ("EPD") requiring the City to reduce the phosphorus discharge to a 0.75 mg/l monthly limit. The Georgia legislature also enacted statutes requiring the City to achieve the same phosphorus level by certain deadlines.

In 1995, Plaintiffs filed this lawsuit contending, *inter alia*, that the City had not achieved, and would not achieve, the phosphorus reductions required by the deadlines in the consent order with the EPD and required by state law. However, the City has now achieved the phosphorus limits of 0.75 mg/l by those deadlines. The City has reduced the phosphorus discharge from 4.86 mg/l in 1988 to the current 0.75 mg/l limit. Thus, the Court **GRANTS** summary judgment on Count One of Plaintiffs' four-count Complaint.

The Court understands Plaintiffs' frustration over the City's not achieving this phosphorus reduction until the very eve of the final deadline. The record reflects that the City originally was required to achieve the 0.75 mg/l monthly phosphorus discharge limit at each treatment plant by December 31, 1991. (*See* Consent Order No. EPD–WQ–1549). The City has been able to convince both the State EPD and the Georgia legislature not only to extend the deadline from 1991 to 1992 and then to July 4, 1996, but also to allow the City to average the phosphorus discharge from all three treatment plants. It is important to stress that Plaintiffs' Count One addressees only the narrow issue of whether the City has now complied with the phosphorus effluent standards currently set forth in the EPD consent order or state law.

Count One does not address the more important, broader issues of whether the State EPD, by giving repeated extensions and setting inadequate effluent standards, is not adequately enforcing the Clean Water Act, or, whether the federal EPA is inadequately performing its statutory obligations designed to ensure States fulfill their duties under the Clean Water Act. These broader issues are being addressed in separate civil cases. Indeed, Judge Marvin H. Shoob's recent Order in another case discusses the State of Georgia's delay in complying with the Clean Water Act as follows:

> Georgia has failed for over 16 years to comply with the Clean Water Act's requirement that states identify total maximum daily loads of pollutants in waters that do not attain applicable standards. At its current pace, Georgia will take more than one hundred years to comply with the Clean Water Act.

*Sierra Club v. John Hankinson*, 939 F.Supp. 865, 867 (N.D.Ga.1996). Judge Shoob's Order sets specific deadlines by which the EPA must establish total maximum daily loads (TMDLs) of pollutants for the water quality limited segments to achieve the Clean Water Act's water quality standards. In addition, Judge Shoob's Order continues that if Georgia fails to implement the TMDLs through the NPDES permit process, then the EPA shall revise the State NPDES program or, if the State refuses, withdraw the NPDES program as follows:

> If Georgia fails to implement TMDLs through the NPDES process, or EPA is otherwise unable to implement the TMDLs through the permit program described above due to State actions or inactions, EPA shall initiate procedures to revise the State NPDES program to incorporate the TMDL process pursuant to 40 CFR § 123.62. If the State refuses to implement TMDLs through the NPDES process, EPA shall withdraw certification of the State NPDES program, pursuant to CWA § 402(c)(3), 33 U.S.C. § 1342(c)(3) and 40 CFR § 123.63(a)(5) (withdrawl permitted where the State has not "develop[ed] an adequate regulatory program for developing water-quality based effluent limits in NPDES permits").

In short, while the City has now met the July 4, 1996 deadline of both the EPD consent order and state law, Count One of this lawsuit, nonetheless, has helped assure that the City reduce its phosphorus discharge sig-

nificantly and at least achieve the limited standards of a 0.75 mg/l monthly average set forth in the current EPD consent order and state law. Whether the State's allowing averaging or giving repeated extensions complies with the Clean Water Act are not issues before the Court, but are being addressed in other lawsuits.

## I. FACTS

### A. Plaintiffs

Plaintiffs are a group of non-profit environmental organizations, city and county governments, a local chamber of commerce, and private property owners. Plaintiffs and/or their members and citizens have various uses for and interests in the Chattahoochee River and its tributaries in the Atlanta area and downstream.

### B. Defendant City's Water Pollution Control Plants ("WPCPs")

The Defendant City owns and operates a sewage treatment system that receives domestic sewage, industrial sewage, and storm water runoff from within the City and from other governmental entities outside the City, including Fulton County, Georgia, and Dekalb County, Georgia. At various locations, the City has sewage treatment plants, sometimes referred to as water pollution control plants or WPCPs, which receive the incoming sewage and storm water runoff, provide treatment, and discharge the treated effluent into the Chattahoochee River and its tributaries. The City's plants include the R.M. Clayton WPCP, the Utoy Creek WPCP, and the South River WPCP.

### C. National Pollution Discharge Elimination System or N.P.D.E.S. Permits

The Federal Water Pollution Control Act, known as the Clean Water Act, governs the discharge of effluents from any point source into navigable waters of the United States. 33 U.S.C. § 1251 et seq. The discharge of effluents from the City's WPCPs into the Chattahoochee and its tributaries falls within the Clean Water Act's ambit. Thus, in order for the City to discharge effluent into the Chattahoochee lawfully, the discharge must be pursuant to a permit issued in accordance with the Clean Water Act. The permit is known as a National Pollutant Discharge Elimination System ("NPDES") permit.

Pursuant to the Clean Water Act, the United States Environmental Protection Agency (the "EPA") has delegated the authority to issue NPDES permits and to administer the NPDES program in the State of Georgia to Georgia's Department of Natural Resources, Environmental Protection Division (the "EPD"). The state law authorizing the EPD to issue NPDES permits and administer the NPDES program is the Georgia Water Quality Control Act ("GWQCA"), O.C.G.A. § 12–5–20 et seq.,; O.C.G.A. § 12–5–23(a)(15).

### D. EPD Orders City To Limit Phosphorus Discharge To 0.75 mg/l by December 31, 1991

Phosphorus is one of the pollutants contained in the effluent discharged from the City's treatment plants into the Chattahoochee River and its tributaries. On December 22, 1989, the Director of the EPD issued Administrative Order EDP–WQ–1549 to the City ordering the City to reduce the impact on West Point Lake of phosphorus discharged from the City's WPCPs into the Chattahoochee and its tributaries. Administrative Order EPD–WQ–1549 required the City to achieve an average phosphorus discharge limitation of 0.75 mg/l by December 31, 1991.

In an administrative proceeding brought by the City to challenge this requirement, an Administrative Law Judge ("ALJ"), acting on behalf of the Board of Natural Resources, issued a Final Decision, dated September 19, 1990, in administrative action DNR–EPD–WQ–AH–2–90, finding that it was "reasonable and practical" for the City to achieve compliance with the 0.75 mg/l phosphorus discharge limitation by December 31, 1991.

Meanwhile, in August, 1990, the City began developing a phosphorus control plan to decrease the amount of phosphorus discharged into the Chattahoochee and to comply with future effluent limitations. As part of the City's phosphorus control plan, the

City planned to construct an underground tunnel to divert excess wastewater and other flow from the R.M. Clayton WPCP to the Utoy Creek WPCP.

E. *In 1991 State Enacts O.C.G.A. § 12–5–23.2 Authorizing Extensions to July 4, 1996 to Achieve Phosphorus Effluent Limitation of 0.75 mg/l*

In 1991, the Georgia General Assembly enacted O.C.G.A. § 12–5–23.2, which prohibited certain NPDES permittees from discharging waste water into the Chattahoochee River between Buford Dam and West Point Reservoir containing more than 0.75 mg/l of phosphorus on a monthly average basis after January 1, 1992. O.C.G.A. § 12–5–23.2 also authorized the EPD to grant a permittee an extension until July 4, 1996 to comply with the phosphorus discharge limitation if the permittee has entered into a "finalized consent order." As enacted, O.C.G.A. § 12–5–23.2 stated as follows:

> Notwithstanding the provisions of Code Section 12–5–23 or any rule, regulations, or order adopted or issued pursuant to this article, *no person* who has been issued a National Pollutant Discharge Elimination System permit which allows the discharge of 1,000,000 gallons or more per day *from a water pollution control plant* operated by such person which discharges. waste water into the Chattahoochee River between Buford Dam and West Point Reservoir *shall discharge waste water from any such water pollution control plant on or after January 1, 1992, which contains more than 0.75 milligrams of Phosphorus per liter of waste water on a monthly average basis or which fails to comply with any stricter standard adopted pursuant to Code Section 12–5–23* . . . .

1991 Ga. L. 1042 (emphasis supplied). In short, the 1991 version of the statute imposes a 0.75 mg/l phosphorus discharge limit effective January 1, 1992, or, effective July 4, 1996 if the discharger has entered into a finalized consent order. Section 12–5–23.2 became effective on July 1, 1991.

F. *City and EPD Enter Consent Order That Allows City To Average Output From Three Plants and To Achieve Phosphorus Discharge Limit by July 4, 1996*

The City and the EPD entered into Consent Order EPD–WQ–1741 on April 21, 1991, in which the EPD required and the City agreed to achieve compliance with a phosphorus discharge limitation of 0.75 mg/l beginning on July 4, 1996 and a phosphorus discharge limitation of 0.64 mg/l by February 1, 1997. The consent order specifies an Effluent Limitation/Compliance Formula that expressly permits the City to average the output of its three WPCPs in determining compliance with the phosphorus effluent limitations in the consent order until July 4, 1996. Consent Order EPD–WQ–1741 also required the City to complete upgrades to its treatment plants by certain dates, including completion of the tunnel by December, 1996, as follows:

NOW, THEREFORE, the Director hereby ORDERS and the City hereby AGREES to the following:

1. To monitor on a daily basis by a flow proportioned composite sample the effluent at each of its WPCPs for phosphorus. The results of this monitoring program shall be reported on the DMRs. submitted by the City.

2. To complete the following WPCP upgrades on or before the dates specified below:

*R.M. Clayton WPCP*

Chemical feed system—January, 1993

Step feed system—July, 1993

Tunnel to Utoy—December, 1996

*Utoy Creek WPCP*

Chemical feed system—December, 1991
Filters—September, 1996

*South River WPCP*

Chemical feed system—March, 1992

3. To make the City's best efforts to achieve compliance with the 0.75 mg/l phosphorus effluent limitation by December 31, 1993. Best efforts will be

deemed to be achieved by complying with the conditions of item 4 below.

4. Beginning in February, 1993 at the R.M. Clayton WPCP, in April, 1992 at the South River WPCP, and in January, 1992 at the Utoy Creek WPCP, and continuing thereafter through June, 1996, operate wastewater treatment facilities to achieve the optimum reduction of phosphorus or a phosphorus effluent concentration less than 0.75 mg/l. The optimum operation shall include, but not be limited to:

a) effective industrial pretreatment to reduce the phosphorus concentrations in the plant influents;

b) determination and implementation of the optimal chemical dosages for phosphorus reduction, consistent with capabilities of the solids removal facilities; and

c) efficient operation of clarifiers and solids removal facilities to reduce the total suspended solids and phosphorus effluent concentration.

5. Meet a monthly phosphorus concentration of 0.75 mg/l or less beginning July 4, 1996 and monthly thereafter through January, 1997. The phosphorus concentration shall be calculated by the following formula:

$$\text{Phosphorus Concentration} = \frac{\text{Total Phosphorus (pounds) from R.M. Clayton, Utoy and South River}}{\text{Total Flow (MGD) from R.M. Clayton, Utoy and South River} \times 8.34}$$

6. Beginning February, 1997, and monthly thereafter meet a monthly Phosphorus concentration of 0.64 mg/l or less (as calculated in Item 4[sic] above).

Consent Order No. EPD–WQ–1741.

The extension granted pursuant to Consent Order No. EPD–WQ–1741 represented an extension of four and one-half years for the City to achieve compliance with the phosphorus discharge limit of 0.75 mg/l. According to Plaintiffs, the extension, granted the City to comply with the effluent discharge limitation, was conditioned on the City's following strictly the conditions of this "finalized consent order."

G. *EPD Issues City Renewal Permits Conditioned On Consent Order No. EPD–WQ–1741*

On June 24, 1992, the EPD issued the following renewal NPDES permits for the City's WPCPs:

NPDES Permit No. GA0021482 for the R.M. Clayton WPCP ·

NPDES Permit No. GA0024040 for the South River WPCP

NPDES Permit No. GA0021458 for the Utoy Creek Plant

These Permits expire on June 23, 1997.

Regarding the discharge of phosphorus, the June 24, 1992 NPDES permits provide:

"The permittee will comply with all terms and conditions of the Consent Order No. EPD–WQ–1741 as they relate to this facility." Consent Order No. EPD–WQ–1741 provided that the City would construct the tunnel. Thus, the permits include the condition that the City construct the tunnel from the R.M. Clayton WPCP to the Utoy Creek WPCP. Subsequent to Consent Order EPD–WQ–1741, the City spent approximately $20 million on design plans for the tunnel.

The tunnel was not designed to treat wastewater, but instead was designed only to divert the flow of wastewater from the R.M. Clayton WPCP to the Utoy Creek WPCP. The City's 1990 Phosphorus Control Plan called for expansion of the R.M. Clayton WPCP, but there was little land, if any, available for the expansion. Thus, the initial Plan called for the tunnel to divert water from Clayton to Utoy Creek and for expansion at Utoy Creek to handle excess water from Clayton.

H. *After Encountering Public Opposition to Tunnel City Revises Phosphorus Control Plan and Deletes Tunnel*

Thereafter, citizens protested the City's plans for the tunnel. Opposition to the tunnel was based on the tunnel's impact to low

income neighborhoods and concerns of racial environmental injustice.[1] In response, the Atlanta City Council adopted Ordinance No. 94-0-0287 on February 21, 1994, authorizing the Mayor to cease all engineering design work related to the construction of the tunnel.

On July 5, 1995, the Atlanta City Council adopted Ordinance No. 95-00-0875, revising the City's plan for the control of phosphorus so that it did *not* include the tunnel. In September, 1995, the City completed a revised phosphorus control plan which removes the tunnel as an element of the City's plan and calls for modifications of the originally planned upgrades at the South River and Utoy Creek WPCPs and an expansion of the R.M. Clayton WPCP. Finally, on October 16, 1995, the Atlanta City Council reiterated its position that the City's phosphorus control plan will *not* include construction of the tunnel.

## I. *City Takes Significant Steps To Reduce Phosphorus Discharge Levels*

While the City has not constructed the tunnel, the City has completed certain other significant upgrades to its sewage treatment facilities. For example, by December 21, 1992, a chemical feed system was installed and was operating at the R.M. Clayton WPCP. Additional feed systems were installed at the R.M. Clayton WPCP while this action was pending and were operating by July 4, 1996. Between January 30, 1992 and February 6, 1992, a chemical feed system was installed and operating at the Utoy Creek WPCP. A chemical feed system had been installed at the South River WPCP when it was constructed in the 1980s, but was not designed to treat phosphorus. By December, 1991, the chemical feed system at the South River WPCP had been modified to treat phosphorus.

Also, the City now requires all industrial dischargers of effluent containing high concentrations of phosphorus to pretreat their effluent discharged to the City's three WPCPs. This pretreatment reduces the phosphorus concentration in the influent of the City's three WPCPs. Additionally, the City determined and implemented the optimal chemical dosages for phosphorus control when it began operating the chemical feed system at each WPCP. However, the South River and Utoy Creek WPCPs are now utilizing biological processes as their primary treatment method and only use the chemical feed systems in upset events.[2] The chemical feed system at the R.M. Clayton will be converted to a biological treatment process by July 4, 1996 and, thereafter, will utilize chemical feed systems only in upset events. Finally, clarifiers are installed and operating at each WPCP. These clarifiers, in part, reduce the total suspended solids and phosphorus effluent concentrations.

## J. *EPD and the City Enter Into Second Consent Order Deleting Tunnel Requirement*

On August 31, 1995, the City developed a revised phosphorus reduction plan. On October 6, 1995, the EPD filed notice of intent to modify the City's NPDES permits for the R.M. Clayton, South River, and Utoy Creek WPCPs. If approved this modification would have removed Part 1.C.9 of each NPDES permit, which incorporates the conditions of Consent Order No. EPD-WQ-1741 (including the tunnel).

On October 26, 1995, the City and the EPD entered into Consent Order No. EPD-

---

1. On February 11, 1994, President Clinton issued a policy statement on environmental justice, which states as follows:

   each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States. . . .
   Executive Order No. 12898, 59 Fed.Reg. 7629 (1994).

2. An upset is "an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factor beyond the reasonable control of the permittee," but does not include "noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation." 40 C.F.R. § 122.41(n)(1) (1995).

WQ–3198. This consent order requires the City to limit the monthly phosphorus concentration in the effluent from the three WPCPs to 0.75 mg/l or less beginning on July 4, 1996 and extending through January, 1997, and requires the City to limit the monthly phosphorus concentration from the three WPCPs to 0.64 mg/l beginning in February 1997. The consent order contains the same formula found in consent order No. EPD–WQ–1741 and, thus, permits averaging the effluent of the City's three WPCPs to determine compliance with the monthly phosphorus effluent limitations. The consent order does not contain the requirement that the tunnel be constructed and presumably was intended to supersede previous Consent Order No. EPD–WQ–1741 for purposes of the NPDES permits. Consequently, under the modified NPDES permits, the City would not have been required to construct the tunnel, but would have been able to average phosphorus levels in effluent at the three WPCPs.

However, Plaintiffs administratively challenged Consent Order No. EPD–WQ–3198 and objected to the EPD's notice of intent to modify the NPDES permits, effectively staying the enforcement of Consent Order No. EPD–WQ–3198. Subsequently, on January 9, 1996, the EPD withdrew its notice of intent to modify the NPDES permits. On June 11, 1996, an administrative law judge ("the ALJ") reversed the issuance of Consent Order No. EPD–WQ–3198 finding the consent order allowed averaging of outputs and, thus, violated the 1991 version of O.C.G.A. § 12–5–23.2 in effect at the time the parties entered into the consent order as outlined above. The phrase "from any such water pollution control plant" in the 1991 statute controlled the ALJ's determination that the 1991 version of O.C.G.A. § 12–5–23.2 required an NPDES permittee to meet the 0.75 mg/l phosphorus discharge limitation at each WPCP and prohibited averaging of phosphorus discharges among several WPCPs.

The ALJ expressly left viable and enforceable Consent Order No. EPD–WQ–1741 and the NPDES permits for the City's three WPCPs. The ALJ did not discuss or rule upon whether the City could delete the tunnel. Thus, the tunnel provision remains in Consent Order No. EPD–WQ–1741.

### K. O.C.G.A. § 12–5–23.2 Amended by the Georgia General Assembly

During the 1996 session, the Georgia General Assembly amended O.C.G.A. § 12–5–23.2 to allow averaging of phosphorus discharges among an NPDES permittee's several WPCPs. The 1991 version of the statute prohibited an NPDES permittee from discharging waste water exceeding the phosphorus limitation "from any such water pollution control plant." However, the 1996 version of the statute prohibits an NPDES permittee from discharging waste water exceeding the phosphorus limitation "from such person's water pollution control plants...." O.C.G.A. § 12–5–23.2 (1996). The change in the statutory language authorized an NPDES permittee to average phosphorus discharges among a permittee's multiple WPCPs to meet the phosphorus effluent limitation. The 1996 version states in relevant part as follows:

(a) Notwithstanding the provisions of code Section 12–5–23, or any rule, regulation, or order adopted or issued pursuant to this article, no person who has been issued a National Pollution Discharge Elimination System permit which allows the discharge of 1,000,000 gallons or more per day from a water pollution control plant operated by such person which discharges waste water into the Chattahoochee River between Buford Dam and West Point Reservoir shall discharge waste water *from such person's water pollution control plants* which contains more than 0.75 milligrams of phosphorus per liter of waste water on a monthly average basis or which fails to comply with any stricter standard adopted pursuant to Code Section 12–5–23.

(b) Notwithstanding the provisions of subsection (a) of this Code section, any person who has been issued a National Pollution Discharge Elimination System permit and who has entered into a finalized consent order shall conform to the schedule adopted in such order as such order appeared on April 25, 1996. Except as provided in subsection (c) of this Code section,

compliance with the discharge limitation provided by this Code section shall not be extended beyond July 4, 1996, and the order shall require that person to make his or her best efforts to achieve compliance with the discharge limitation by December 31, 1993.

O.C.G.A. § 12–5–23.2 (1996) (emphasis supplied).

### L. *As of July 4, 1996, City Meets 0.75 mg/l Phosphorus Discharge Limit Based on Average Output*

As a result of the upgrades to its facilities and other operational changes, the City has reduced the phosphorus discharge level and has met the relevant phosphorus discharge limitations in Consent Order No. EPD–WQ–1741 by July 4, 1996. When Plaintiffs filed this law suit in 1995, Plaintiffs contended that Defendant City would not meet this goal, but it has done so.

It is undisputed that the yearly average of phosphorus concentrations discharged from all the City's WPCPs has decreased steadily from 1988 through 1995. Specifically, the yearly average of phosphorus concentrations is as follows: 4.86 mg/l in 1988, 3.39 mg/l in 1989, 2.24 mg/l in 1990, 1.76 mg/l in 1991, 1.43 mg/l in 1992, 0.98 mg/l in 1993, 0.96 mg/l in 1994, and 0.87 mg/l in 1995. It is also undisputed that between 1988 and 1995 the City's discharge of phosphorus from each of the respective WPCPs has frequently exceeded a monthly average of 0.75 mg/l. Specifically, between 1992 and 1995, the R.M. Clayton plant has exceeded 0.75 mg/l in 46 months, the South River plant has exceeded 0.75 mg/l in 11 months, and the Utoy Creek plant has exceeded 0.75 mg/l in 31 months. However, by July 4, 1996, the City did achieve a 0.75 mg/l a combined average monthly discharge of phosphorus from the three plants.

### M. *Fulton County's Motion To Intervene*

On February 2, 1996, Fulton County filed a Motion to Intervene in this action. Fulton County's interest in this litigation focuses, in part, on the construction of the tunnel. In its Motion, Fulton County contended that its citizens, specifically those residing in South and Southwest Fulton County will be affected adversely by the tunnel, and that Fulton County will be affected by any alteration or expansion of the sewer system within the County. The Court denied Fulton County's motion as to the liability portion of the litigation, but found that Fulton County had a legally protectable interest in the remedial portion of the litigation not protected adequately by the City and granted Fulton County's Motion to Intervene in the remedial portion of the litigation. (*See* Order dated May 16, 1996 [38–1].)

## II. *SUMMARY JUDGMENT STANDARD*

Pursuant to Federal Rule of Civil Procedure 56(c), a court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Entry of summary judgment in favor of the moving party is appropriate when the non-moving party has failed to produce evidence "sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, the threshold inquiry undertaken by the trial court when considering whether to grant summary judgment requires "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by the finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

The moving party bears the initial burden of demonstrating that no genuine issue of material fact remains to be decided at trial. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–09 (11th Cir.1991). Once this burden

has been met, the burden shifts to the non-moving party to demonstrate that, in fact, a genuine issue of material fact does exists. *Id.* at 608–09. If neither party can show either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the nonmoving party will be unable to meet its ultimate burden of proof at trial. *Celotex Corp,* 477 U.S. at 323–25, 106 S.Ct. at 2552–54. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's claim. *Id.* An issue of material fact is not genuine if the issue is unsupported by the evidence, or if the issue is created by evidence that is "merely colorable" or "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511; *see also Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); *Hudson v. Southern Ductile Casting Corp.,* 849 F.2d 1372, 1376 (11th Cir.1988).

## III. *DISCUSSION*

On October 10, 1995, Plaintiffs brought this action against the City alleging violations of the Clean Water Act in Counts One and Two, and alleging state law claims of nuisance and trespass in Counts Three and Four. This Order narrowly addresses only the parties' cross motions for summary judgment on Count One.

The City argues that summary judgment should be granted in its favor on these several grounds: (1) the phosphorus effluent limitation contained in the NPDES permit is pursuant to state environmental regulation that cannot be enforced through citizen suits under the Clean Water Act; (2) the phosphorus effluent limitation that forms the basis of Plaintiffs' Complaint does not become effective under either Consent Order No. EPD–WQ–1741 or O.C.G.A. § 12–5–23.2 until July 4, 1996 and, thus, any allegations about violations of the effluent limitation were not ripe for adjudication when this suit was filed; (3) Plaintiffs have presented no evidence of an ongoing violation of the requirement in Consent Order No. EPD–WQ–1741 that the City make best efforts to achieve compliance with the effluent limitation by December 31, 1993; and (4) with regard to upgrade requirements in Consent Order No. EPD–WQ–1741, including the tunnel, Plaintiffs have failed to demonstrate a violation of a "schedule of compliance" within the meaning of the Clean Water Act.

In response, Plaintiffs contend that summary judgment should be granted in their favor because: (1) citizens may bring suits in federal court under the Clean Water Act to enforce state effluent limitations; (2) under the 1991 version of O.C.G.A. § 12–5–23.2, the City was required to comply with the phosphorus effluent limitation beginning not on July 4, 1996 but on January 1, 1992, which it failed to do; (3) the City has not made its best efforts to comply with the phosphorus effluent limitation by December 31, 1993; and (4) the City has failed to conform to the list of upgrades adopted in Consent Order No. EPD–WQ–1741, specifically the tunnel.

### A. *CITIZENS CAN ENFORCE STATE–IMPOSED EFFLUENT LIMITATIONS IN AN NPDES PERMIT THROUGH A CLEAN WATER ACT CITIZEN SUIT*

The City contends that the Clean Water Act does not authorize citizen suits for the enforcement of conditions imposed pursuant to state law in an NPDES permit. However, the Court finds that Plaintiffs do have standing under the Clean Water Act to pur-

sue this claim because their suit seeks to enforce an "effluent standard or limitation under the [Clean Water] Act." 33 U.S.C. § 1365 (§ 505 of CWA).[3]

Section 1365 of Title 33 of the United States Code, § 505 of the Clean Water Act, authorizes a citizen to bring a civil action against either the federal government or some other governmental agency that is alleged to have violated either (1) an effluent standard or limitation under the Clean Water Act or (2) an order issued by a state or the EPA regarding such a standard or limitation. 33 U.S.C. § 1365(a)(1). A review of the statutory scheme of the Clean Water Act reveals that an effluent standard or limitation under the Clean Water Act includes an effluent standard or limitation established by a state to further the goals of the Clean Water Act.

The express objective of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity" of the Nation's waters. 33 U.S.C. § 1251(a) (CWA § 101). Although the Clean Water Act imposes standards and effluent limitations to further this objective, it also expressly reserves to the states the right to adopt and enforce state standards or limitations more stringent that those imposed by the federal government. 33 U.S.C. § 1370 (CWA § 510). More stringent state limitations in furtherance of the Clean Water Act's objective include "those necessary to meet water quality standards, treatment standards, or schedules of compliance...." 33 U.S.C. § 1311(b)(1)(B) (CWA § 301).

The Clean Water Act also establishes a procedure by which a state, rather than the EPA, may administer its own NPDES program regulating discharges into navigable waters within the state. Once approved by the EPA, the state may issue NPDES permits to insure compliance with both federal and state limitations. 33 U.S.C. § 1342(b)(1)(A).

The citizen suit provision of the Clean Water Act expressly provides that an effluent standard or limitation under the Clean Water Act includes, among other things, "an effluent limitation or other limitation" issued under 33 U.S.C. § 1311 or "a permit or condition thereof" issued under 33 U.S.C. § 1342, both provisions of the Clean Water Act that recognize state standards and limitations. 33 U.S.C. § 1365(f)(2) & (6). Furthermore, an "effluent limitation" is defined as "any restriction established *by a State* or the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources." 33 U.S.C. § 1362(11) (emphasis supplied).

Given the forgoing, it is clear the Clean Water Act expressly contemplates stricter state effluent and other limitations deemed necessary by the state to restore the integrity of the waters within the state, allows states to incorporate those limitations into a state-issued permit, and authorizes a citizen suit to enforce those limitations. *See Northwest Environmental Advocates v. Portland,* 56 F.3d 979, 985–90 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2550, 135 L.Ed.2d 1069 (1996) (holding citizen suit jurisdiction exists to enforce permit conditions based on state-established standards); *Culbertson v. Coats American, Inc.,* 913 F.Supp. 1572, 1581–82 (N.D.Ga.1995) (holding that "the CWA authorizes citizen suits for the enforcement of all conditions of NPDES permits" including those imposed by Georgia law); *see also Environmental Protection Agency v. California,* 426 U.S. 200, 223–24, 96 S.Ct. 2022, 2033–34, 48 L.Ed.2d 578 (1976) (stating that citizen suits against permit holders under 33 U.S.C. § 1365(f)(6) may be brought if citizen can show violation of either "conditions imposed in accordance with EPA promulgated effluent limitations and standards and ... those imposed in accordance with more stringent standards and limitations established by a State pursuant to § 510 [of the Clean Water Act, 33 U.S.C. § 1370]"). *But see Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.,* 12 F.3d 353, 358–59 (2d Cir.1993), *cert. de-*

---

**3.** Initially, Plaintiffs argue that because the City did not raise this argument in its Brief in Support of its Motion for Summary Judgment [26–1], it has been waived. However, the City correctly points out that this issue is one of subject matter jurisdiction that the Court must address whenever it is raised. Fed.R.Civ.P. 12(h)(3).

*nied,* —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 19 (1994) (holding private citizens have no standing to enforce broader state regulations contained in NPDES permits). Therefore, the Court determines that the instant suit seeks to enforce an "effluent standard or limitation" under the Act and Plaintiff's have standing under the Clean Water Act to pursue this claim.

### B. *CITY HAD UNTIL JULY 4, 1996 DEADLINE TO COMPLY WITH PHOSPHORUS LIMIT IN O.C.G.A. § 12–5–23.2*

#### 1. *Consent Order Allows City to Average and Meet Deadline by July 4, 1996*

Under Consent Order EPD–WQ–1741 and the NPDES permits that incorporate its terms and conditions, the City is required to "[m]eet a monthly phosphorus concentration of 0.75 mg/*l* or less beginning July 4, 1996 and monthly thereafter through January 1997." The phosphorus concentration is calculated using a formula that permits the City to average the total phosphorus discharge from all three WPCPs. Therefore, under the consent order and NPDES permits, the City is not required to reach the 0.75 mg/*l* limitation until July 4, 1996, at which time it will be permitted to average the phosphorus discharge among the three WPCPs to meet the limitation. The City is not the only political unit upriver of West Point Reservoir that is permitted to meet the 0.75 mg/*l* phosphorus limit by averaging. The two WPCPs operated in Cobb County, R.L. Sutton and South Cobb, both calculate their phosphorus discharge using a formula hat is identical to the one contained in Consent Order No. EPD–WQ–1741.

#### 2. *1991 Statute Does Not Allow Averaging and Has January 1, 1992 Deadline, But Provides Exception Where Consent Order Exists*

As enacted in 1991, O.C.G.A. § 12–5–23.2 ("the 1991 statute") did not permit NPDES permittee to discharge phosphorus in concentrations above 0.75 mg/*l* after January 1, 1992 and did not permit averaging of discharges from multiple WPCPs to meet the phosphorus limitation. However, the 1991 statute provided an exception. If a permittee had entered into a finalized consent order, the permittee was not to comply with the 0.75 mg/*l* phosphorus limit, but rather to conform to the schedule of compliance in the consent order. This exception was only effective until July 4, 1996, after which time the permittee was required to comply with the 0.75 mg/*l* phosphorus limit. In other words, the 1991 statute extended the time of compliance with the phosphorus limit for permittees operating under a consent order to July 4, 1996. *See* 1991 Ga. L. 1042. Thus, in the instant case, under the 1991 version of the statute, the City had a finalized consent order that controlled compliance with phosphorus discharge limits over the statute until July 4, 1996.

#### 3. *1996 Statute Allows City to Average and Meet Deadline by July 4, 1996*

In 1996, O.C.G.A. § 12–5–23.2 was significantly expanded and amended ("1996 statute"). *See* 1996 Ga. L. 1618. Nonetheless, the 1996 statute also contains the "finalized consent order" exception extending compliance with the phosphorus limit to July 4, 1996. Therefore, the 1996 statute did not affect the City's extension of compliance with the statute's phosphorus limit until July 4, 1996. In any event, even without the consent order exception, the 1996 statute allows the City to average and to have until July 4, 1996 to meet the 0.75 mg/*l* phosphorus limit. The Georgia legislature deleted the language "from any such water pollution control plant" found in the 1991 statute and substituted "from such person's water pollution control plants" in the 1996 statute, which now allows the City to average the phosphorus discharge among its various plants.

#### 4. *1991 Statute Provides Consent Order Takes Precedence Over Statute*

◼ The Plaintiffs contend that the 1991 version of the statute governs this case. Plaintiffs argue that, under the 1991 statute, a permittee's ability to qualify for the exemption from the 0.75 mg/*l* limitation is conditioned upon the permittee's conformance with the finalized consent order. Under this construction of the statute, if the City failed

to conform to the terms and conditions of the consent order, the City became ineligible for the July 4, 1996 extension under the statute for compliance with the phosphorus limit and was required to comply with the 0.75 mg/*l* phosphorus limit beginning on January 1, 1992. Thus, under Plaintiffs' argument, the City violated the phosphorus limit every month it exceeded 0.75 mg/*l* limitation at each WPCP after January 1, 1992.

The Court disagrees. Nothing in the language of either version of the statute can be read to condition the July 4, 1996 compliance extension upon conformance with the consent order or impose retroactive liability calculated back from January 1, 1992. Indeed, as the City correctly notes, O.C.G.A. § 12–5–23.2 does not address the consequences of a failure to comply with the finalized consent order. Instead, the purpose of the statute is to provide that a consent order takes precedence over the statute if a consent order is in place. This is particularly true here where a consent order was in place before the 1991 statute became effective on April 21, 1991.

The City asserts that the 1996 statute is applicable in this case. However, because the Court determines that both versions of the statute allow the City until July 4, 1996 to comply with the 0.75 mg/*l* phosphorus limitation, the Court finds it unnecessary to determine which version of the statute is applicable.[4]

The Court finds as a matter of law that as of July 4, 1996 the City has not violated the phosphorus effluent limitation contained in O.C.G.A. § 12–5–23.2 or any of the phosphorus effluent limitations contained in Consent Order No. EPD–WQ–1741. Accordingly, the Court grants summary judgment in the City's favor on this issue.

## C. CITY'S COMPLIANCE WITH BEST EFFORTS REQUIREMENT IN CONSENT ORDER

■ Plaintiffs also argue that the City has not complied with the terms and conditions

of Consent Order No. EPD–WQ–1741. Although the 1991 and 1996 statutes extended the final deadline to achieve the 0.75 mg/*l* phosphorus limit to July 4, 1996, Plaintiffs stress the express terms and conditions of the consent order (and NPDES permits) still required the City to make its best efforts to achieve compliance with the 0.75 mg/*l* limitation by December 31, 1993. Plaintiffs appear to contend that the City has not used best efforts and is in violation of this condition of Consent Order No. EPD–WQ–1741.

The consent order deems best efforts to be achieved when the City operates each of the WPCPs to achieve by a designated date either (1) "the optimum reduction of phosphorus" or (2) "a phosphorus monthly effluent concentration less than 0.75 mg/*l*."[5] Under the consent order, if the City opts to achieve optimum operation rather than meet the phosphorus limitation, it must include (but is not limited to) the following: (1) "effective industrial pretreatment to reduce the phosphorus concentrations in the plant influents," (2) "determination and implementation of the optimal chemical dosages for phosphorus reduction, consistent with capabilities of the solids removal facilities," and (3) "efficient operation of clarifiers and solids removal facilities to reduce the total suspended solids and phosphorus effluent concentrations." The City has not met the 0.75 mg/*l* phosphorus effluent limitation at each WPCP on the designated dates. Therefore, in order to be deemed to have made best efforts, the City must have operated each WPCP to achieve the optimum reduction of phosphorus.

It is undisputed that the City requires all industrial dischargers of effluent containing high concentrations of phosphorus to pretreat their effluent discharged into the three WPCPs. It is also undisputed that the City determined and implemented the optimal

---

4. Regarding Count One, Plaintiffs have presented no evidence regarding phosphorus concentrations discharged after July 4, 1996 and the Court does not address any issues related thereto.

5. The following are the deadlines for each WPCP: the R.M. Clayton WPCP by February 1993, the South River WPCP by April 1992, and

the Utoy Creek WPCP by January 1992. Once each WPCP achieves either optimum reduction of phosphorus or a phosphorus monthly effluent concentration less than 0.75 mg/*l* by its respective deadline, it must continue to do so through June, 1996.

chemical dosages for phosphorus reduction when it began operating the chemical feed system at each WPCP. The chemical feed system at each WPCP began operating before its respective deadline.[6] Finally, clarifiers have been installed and are operating at each WPCP and these clarifiers help reduce the total suspended solids and phosphorus effluent concentrations. Plaintiffs admit that the City has steadily decreased phosphorus concentrations at the three WPCPs over the last five years, and Plaintiffs have produced no evidence to suggests that the City has failed to achieve optimum operation of its WPCPs.

Accordingly, the Court finds that no genuine issue of material fact exists regarding whether the City has made its best efforts to achieve compliance with the 0.75 mg/*l* phosphorus effluent limitation by December 31, 1993, and the Court grants summary judgment in favor of the City on this issue.

### D. *THE CITY'S COMPLIANCE WITH UPGRADES REQUIREMENT*

The City has performed many of the upgrades referred to in the consent order's list of upgrades to be completed at each WPCP by specified dates. In addition, the City has voluntarily performed additional upgrades, specifically installing biological phosphorus removal systems. Plaintiffs stress the City still has not complied with certain upgrades discussed below.

#### 1. *Chemical Feed System at Utoy Creek WPCP*

■ Consent Order No. EPD–WQ–1741 requires the City to install the chemical feed system at Utoy Creek WPCP by December, 1991. The City completed the installation of a chemical feed system at the Utoy Creek WPCP between January 30, 1992 and February 2, 1992. Plaintiff emphasizes that the City missed its deadline for installation of the chemical feed system at the Utoy Creek WPCP by slightly more than a month.

■ A citizen-suit may be brought only for violations that are ongoing. *Gwaltney of*

*Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59, 108 S.Ct. 376, 382, 98 L.Ed.2d 306 (1987). An "ongoing violation" can be shown "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact would find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 693 (4th Cir. 1989). Plaintiffs present no evidence demonstrating either actual violations after the date of filing suit or a reasonable likelihood that intermittent or sporadic violations would recur with regard to the chemical feed system. The City's one month delay in installing the chemical feed system almost four years before Plaintiffs filed their complaint does not constitute an ongoing violation within the meaning of the Clean Water Act. Plaintiffs' claim regarding the installation of the chemical feed system at Utoy Creek is, therefore, moot. *See also Satterfield v. J.M. Huber Corp.*, 888 F.Supp. 1561, 1566 (N.D.Ga.1994).

#### 2. *Step Feed System at R.M. Clayton WPCP, Filters at Utoy Creek WPCP, and Tunnel*

■ Plaintiffs next stress that the City still has not completed the following upgrades: (1) the installation of a step feed system at the R.M. Clayton WPCP by July 1993, (2) the construction of a tunnel from the R.M. Clayton WPCP to the Utoy Creek WPCP by December 1996, (3) the installation of filters at the Utoy Creek WPCP by September 1996. The Court notes that Plaintiffs do not maintain at any point in the record that these upgrades should be performed. Plaintiffs merely point to these failures to comply with the finalized consent order as a justification for imposing a deadline of January 1, 1992 upon the City for compliance with the 0.75 mg/*l* effluent limitation.

The City argues that its failure to comply with the remaining upgrade requirements does not constitute a violation of a "schedule of compliance" within the meaning of the Clean Water Act. Under the Clean Water

---

**6.** The R.M. Clayton WPCP began operating its chemical feed system by December 21, 1992, the South River WPCP by December, 1991, and the Utoy Creek WPCP by February 6, 1992.

Act, a "schedule of compliance" is defined as "a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard." 33 U.S.C. § 1362(17) (§ 502 of CWA). The City argues that, because modifications of the originally planned upgrades at the South River, Utoy Creek, and R.M. Clayton WPCPs pursuant to its 1995 Revised Phosphorus Control Plan make the originally planned tunnel, filters, and step-feed system unnecessary to comply with the phosphorus effluent limitation that goes into effect on July 4, 1996, these upgrades are not remedial measures "leading to compliance" with the effluent limitation. The Court agrees.

■ The upgrade requirements are capital improvements designed to further the City toward its goal of meeting the 0.75 mg/$l$ Phosphorus limitation by July 4, 1996. Modifications from the 1990 Phosphorus Control Plan to the City's 1995 Phosphorus Control Plan render these capital improvements superfluous. The required upgrades found in the consent order represent a plan devised by the City and EPD whereby, in stages and over time, the City ultimately can meet the effluent limitation effective July 4, 1996. The interpretation of "schedules of compliance" urged upon the Court by Plaintiffs requires rigid compliance with upgrades requirements and would not permit deviation from this plan even if subsequent design improvements or technological advancements or other environmental measures (such as pre-treatment and implementing biological phosphorus removal processes) rendered these upgrades completely unnecessary to comply with an effluent limitation. Such an inflexible approach could lead to the installation of expensive, necessary, or technologically obsolete equipment. The Court determines as a matter of law that deviations from the list of upgrades contained in the consent order and incorporated into the NPDES permits do not always constitute an *ipso facto* violation of a schedule of compliance within the meaning of the Clean Water Act as a matter of law. Instead, that determination must be made on an individual case basis depending on the facts and circumstances of each case.

■ Thus, turning to the filters at the Utoy Creek WPCP, the step feed system at the R.M. Clayton WPCP, and the tunnel between the R.M. Clayton and Utoy Creek WPCPs, the City admits that it will not construct the tunnel and will install the redesigned filter system only after the project is put out for bid in late 1996. Plaintiff argues that these admissions amount to an anticipatory repudiation of the consent order and NPDES permits. Plaintiffs fail to cite any support for their argument that anticipatory repudiation, a contract concept, is a ground for imposing liability under the Clean Water Act. In fact, as the City points out, the principle of anticipatory breach is contrary to the statutory scheme of the Clean Water Act, which provides modification of NPDES permits issued under state programs. 33 U.S.C. § 1342(b)(1)(C).

More importantly, the tunnel was never designed to treat wastewater, only to transport wastewater from the R.M. Clayton WPCP to be treated at the Utoy Creek WPCP. The plan to construct the tunnel between the two plants was dropped after the City encountered neighborhood opposition to the proposed tunnel project. Given that the water is no longer going to be diverted from the R.M. Clayton WPCP, the City has made other revisions to the implementation of the upgrades at the three WPCPs to meet the City's goals. These upgrade redesigns made the installation of the step feed system at R.M. Clayton WPCP unnecessary. Additionally, because the elimination of the tunnel will result in lower-than-planned flow to Utoy Creek WPCP, the filters that were to be installed at the Utoy Creek WPCP by September 1996 are being redesigned and will be ready for construction bid by late 1996. Finally, all three plants have been modified and converted to operate using biological phosphorus removal processes to increase the treatment abilities of these WPCPs.

In any event, the City has stated it intends to pursue modification of the three NPDES permits to reflect the City's latest phosphorus control plan. It is entirely possible that prior to the deadlines for these upgrades, the City's permits will be modified such that

installation of the filters and completion of the tunnel will no longer be required. Consequently, the principle of anticipatory breach does not comport with a statutory scheme that allows revisions to obligations prior to the effective date of those obligations. Therefore, the Court finds as a matter of law that the City's failure to comply with deadlines that have not yet passed does not constitute a violation of the Clean Water Act.

### E. *PLAINTIFFS' MOTION FOR PROTECTIVE ORDER*

During the course of discovery, the deposition of a representative of Upper Chattahoochee Riverkeeper Fund, Inc., Ms. Sally Bethea, was noticed and scheduled. On the day of the deposition, counsel for Fulton County appeared and informed counsel for Plaintiffs that she would attend the deposition. After the City completed its questioning of the witness, counsel for Fulton County, over objection of counsel for Plaintiffs, questioned the witness. Counsel for Fulton County first asked the witness for the names and addresses of the board of directors of the Upper Chattahoochee Riverkeeper Fund. Counsel for Plaintiffs objected to the question as outside the scope of the remedial issues presented in the litigation and, therefore, outside the scope of Fulton County's right to intervene. Counsel for Fulton County withdrew the question and asked the witness whether she had ever personally observed raw sewage at the headwaters of West Point Lake. Again counsel for Plaintiffs objected and adjourned the deposition to seek a protective order from the Court. On the following day, counsel for Fulton County appeared at the deposition of a representative of the Chattahoochee Riverkeeper, Inc., Ms. Karen Plant, but was denied an opportunity to question the witness and was served with Plaintiff's Motion for a Protective Order.

■ Plaintiff Upper Chattahoochee Riverkeeper Fund, Inc. (Upper Chattahoochee Riverkeeper) moves for a protective order prohibiting Fulton County from questioning Plaintiff Upper Chattahoochee Riverkeeper or any other Plaintiffs on deposition. Alternatively, Upper Chattahoochee Riverkeeper requests the Court limit Fulton County's participation in discovery to interrogatories specifically directed to any remedies proposed to be served only after liability is established. For the reasons that follow, the Court **DENIES** in part and **GRANTS** in part Plaintiff's request for a protective order and **ORDERS** Fulton County to limit its discovery to remedial issues. Fed.R.Civ.P. 26(c)(4).

To limit Fulton County's participation in this matter to a period in time after discovery has concluded and liability is determined would diminish greatly Fulton County's ability to determine sufficient facts to make informed decisions during the remedial phase of this action. Furthermore, the interests of judicial economy would not be served by requiring Fulton County to petition the Court to re-open discovery after the determination of liability for the purpose of gathering information so that it could adequately participate in the remedial stage. For these reasons, the Court **DENIES** Plaintiff's Motion to the extent it seeks to prohibit Fulton County from participating in discovery before liability is determined. Discovery having expired November 16, 1996, the Court **ORDERS** discovery re-opened for twenty days from the date this Order is entered for the limited purpose of permitting Fulton County to take Plaintiffs' depositions.

■ However, the Court finds that the two questions asked by Fulton County at the deposition of Ms. Bethea were outside the scope of the interest for which Fulton County was permitted to intervene and, thus, outside the scope of Fulton County's permissible discovery. Consequently, the Court finds Plaintiffs objection to these questions substantially justified and **DENIES** Fulton County's request for expenses and attorney's fees. Further, the Court **GRANTS** Plaintiff's Motion to the extent it seeks to protect its representative from being asked questions outside the scope of the remedial issues in this case.

### IV. *CONCLUSION*

For the forgoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judg-

ment [28–1] and **GRANTS** Defendant's Motion for Summary Judgment [26–1] on the issue of liability for violations of the NPDES permits. The Court **DENIES** in part and **GRANTS** in part Plaintiffs' Motion for a Protective Order. The Court **ORDERS** discovery re-opened and extended for twenty days from the date of this Order for the limited purpose of allowing Fulton County to take certain depositions to be limited to remedial issues only. The Court **DENIES** Plaintiffs' Motion to Strike the Affidavits of David Kamps and Alan Hallum [40–1]. Finally, the Court **GRANTS** Defendant's Motion for Leave to File Supplemental Factual Background in Support of its Motion for Summary Judgment [50–1].

Pursuant to the Court's Order of November 21, 1996 [63–1], the parties have until December 19, 1996 to file motions for summary judgment on the issues remaining in this case. The parties shall file a Consolidated Pre-trial Order thirty days after the Court rules on these additional motions.