**Tracy HENDRICKS, Plaintiff,**

v.

**BAPTIST HEALTH SERVICES, Defendant.**

**Civil Action No. 02–F–700–N.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 21, 2003.

Jon C. Goldfarb, Maury Steven Weiner, Kell A. Simon, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for plaintiff.

Frederick L. Warren, Leanne C. Mehrman, Ford & Harrison, Atlanta, GA, C. Mark Bain, Melton Espy Williams & Hayes, PC, Montgomery, AL, for defendant.

---

## MEMORANDUM OPINION AND ORDER

FULLER, District Judge.

Plaintiff, Tracy Hendricks, filed a Complaint (Doc. # 1) on June 18, 2002, alleging claims pursuant to 42 U.S.C.1981 (hereinafter "Section 1981") against her former employer, Baptist Health Services (hereinafter "Baptist"). On July 25, 2002, Defendant Baptist filed its Answer (Doc. # 4).

This action is presently before the court on the motion for summary judgment filed by the defendant on April 21, 2003 (Doc. # 16). After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court concludes that the motion for summary judgment is due to be GRANTED.

## I. FACTS[1] AND PROCEDURAL HISTORY

The court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to Baptist's motion for summary judgment. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts:

### A. Plaintiff's Employment History with Baptist

Plaintiff, an African–American female, had a short-lived employment relationship with Baptist. She was hired in March of 2000 and two years later, in May of 2002, she was terminated. Nonetheless, what occurred during this short stint of employment is the basis of Plaintiff's complaints.

Plaintiff was hired as a customer service representative (hereinafter "CSR") in the Central Business Office (hereinafter "CBO"). Her initial job responsibilities

---

1. This recitation of "facts" is based upon materials presented by the parties, viewed in the light most favorable to the plaintiff.

included answering the telephones as part of a phone answering queue. Specifically, Plaintiff, as a CSR, fielded telephone calls from patients concerning their bills, bill payments, or any other complaints of the patients; responded to internal and external e-mails; and assisted walk-in patients.

At the time she was hired, Plaintiff was supervised by Teri Meintel (hereinafter "Meintel"), CSR Manager. Meintel supervised customer service, postings and refunds. Moreover, at that time, the management staff of the CBO consisted of Meintel, Stefanie Prestage (hereinafter "Prestage"), Billing Manager; Reena Rodgers (hereinafter "Rodgers"), Billing Director; Kim Stephens (hereinafter "Stephens"), CSR/Collections Director; and Rick Roney (hereinafter "Roney"), Vice President of Business Operations.

Baptist has promulgated written policies, which includes a progressive discipline system. This discipline system is set forth in Baptist's Corrective Action policy which provides, in relevant part:

> Employment with [Baptist] is terminable at will, meaning that employment is for an indefinite period, and either [Baptist] or the employee may terminate the

relationship at any time, for any reason. However, we believe in treating employees fairly and we try to be consistent in dealing with disciplinary and performance issues. We also believe in using progressive discipline in most circumstances.

> By "progressive discipline," we mean imposing disciplinary action in steps, such as verbal warning, written warning, suspension, and termination ... Department managers are responsible for and have the authority to determine the severity of a particular problem and act appropriately under all circumstances. However, these guidelines are used to determine when progressive discipline is appropriate and the level of discipline that will usually be warranted for various policy infractions or performance deficiencies.

(Hendricks Dep., Ex. 8, p. 39). An infraction of Baptist's policies ordinarily is met first with a verbal warning. Subsequent infractions generally result in a written warning. However, no set number of verbal warnings mandates a written warning. At the supervisor's discretion, successive written warnings can result in "suspension" or "termination." [2]

---

2. Specifically, the Corrective Action policy states as follows:

"A" Type Offenses: Typically Calling for Progressive Discipline Beginning with Verbal Warning—The following are examples of conduct which generally calls for progressive discipline beginning with a verbal warning to the employee. If the behavior continues, a written warning may be necessary. Written warnings indicate that suspension or termination may occur if the problem continues. (1) Chronic absenteeism/tardiness. (2) Leaving work area without permission. (3) Wasting work time (including personal telephone calls). (4) Unauthorized extension of break or meal time. (5) Failure to clock in or clock out properly. (6) Failure to follow safety guidelines (including life safety regulations, parking, traffic, etc.). (7) Failure to comply with dress code policy. (8) Failure to display ID badge properly. (9) Failure to obtain authorization to work overtime in advance. (10) Abuse of PTO/EID. (11) Accepting money or gifts from patients, visitors or current/prospective vendors. (12) Failure to maintain positive working relationships with co-workers.

"B" Type Offenses: Typically Calling for Progressive Discipline Beginning with a Written Warning—The following are examples of conduct which generally are serious enough to call for a written warning as a first step. The written warning states that suspension or dismissal may be warranted if the behavior reoccurs. (1) Failure to maintain acceptable standards of work performance. (2) Violation of facility/departmental policy. (3) Violation of no-solicitation/no-distribution policy. (4) Being discourteous to patients, visitors, or em-

In August of 2000, Plaintiff received a verbal warning from Meintel for being tardy twelve times in less than three months. The Employee Counseling Form[3] (hereinafter "ECF") dated for August 21, 2000 indicates that since June 1, 2000, Plaintiff had been tardy twelve times and that Plaintiff was tardy four times during the week of August 14–18, 2000. Plaintiff indicated on the ECF that she "understand[s] the importance of being on time—[and] will improve this area of [her] performance"[4] (Hendricks Dep., Ex. 19).

In early 2001, Baptist closed its in-house collection agency. As a result of this closing, the CBO began performing certain tasks which had previously been performed by the in-house collection agency. These tasks included handling bankruptcy notices and coordinating with outside collection agencies.[5]

In the spring of 2001, Plaintiff, along with another CSR, began to assume some responsibilities for processing bankruptcy notices and interacting with collection agencies. Over time, Plaintiff became the primary CSR to handle bankruptcy notices, collection agencies and walk-in patients.

ployees. (5) Engaging in arguments or horseplay. (6) Use of profanity. (7) Failure to comply with department policy on reporting to work. (8) Failure to report injuries or incidents involving patients, visitors, physicians, or other employees. (9) Making false or malicious statements about patients, visitors, physicians, or other employees. (10) Smoking in unauthorized areas. (11) *Attempting to wear scrubs owned by [Baptist] away from [Baptist] premises.*
**"C" Type Offenses: Typically Calling for Suspension or Investigation with Termination Possible**—The most serious types of problems may call for suspension or dismissal without prior verbal or written warnings. For this type of conduct, employees may be suspended immediately, pending an investigation. The suspension is immediate, not at the convenience of the department. Upon completing the investigation, if the employee is cleared of the offense, then the employee shall be reinstated and paid at the rate of pay for all scheduled work time during the suspension. If it is found that the employee has committed an offense, the suspension will remain valid, or where warranted, the offense may result in termination. The following is a list of examples of the most serious types of problems: (1) Insubordination. (2) Unauthorized possession, use, or distribution of intoxicating liquids or illegal drugs on [Baptist] Health property, and/or reporting to work under the influence of intoxicants or drugs. (3) Failure to report and submit an acceptable sample for a required substance abuse test. (4) Possession of explosives, fireworks, or dangerous weapons on [Baptist] premises. (5) Unauthorized use of, removal of, theft of, or intentional damage to [Baptist] property and/or the property of a patient, visitor, or employee. (6) Gambling on [Baptist] premises. (7) Violation of patient confidentiality policy, including willful or idle conversation concerning *patients or their records.* (8) Falsification of personnel records, time and attendance records, [Baptist] records, or other forms of dishonesty. (9) Job Abandonment. (10). Conviction of a criminal offense. (11) Other conduct which might be detrimental to the organization's reputation or standing within the community. (12) Failure to maintain acceptable standards of work performance. (13) Use of abusive or threatening language or fighting. Corrective actions are part of the permanent record and are not subject to time limits.
(Hendricks Dep., Ex. 8, p. 39–41).

3. The ECF documents a discussion about the unacceptable behavior or performance, the *corrective action taken, the supervisor's* expectations, the consequences for further violations or failure to improve performance, and what the employee intends to do to correct the problem.

4. Both Meintel and Plaintiff signed the ECF.

5. When Baptist receives notice of an individual having declared bankruptcy, Baptist is required to cease all collection efforts on that individual's account.

In April of 2001, Meintel contacted Plaintiff by e-mail regarding her failure to remain current on her e-mails. Meintel's e-mail, dated April 23, 2001, stated, "[l]ast week I mentioned you had a lot of emails to answer. Please have your emails caught up to only two days behind."

In May of 2001, Meintel resigned from her position as CSR Manager.[6] According to Plaintiff, after she learned of Meintel's resignation, she spoke to Roney and expressed her interest in the CSR Manager position. Roney informed Plaintiff that the position would not be filled because existing employees would simply perform additional job duties. Shortly thereafter, Debbie Young (hereinafter "Young"), a Caucasian female, was hired as the CSR Manager and became Plaintiff's direct supervisor.

On June 21, 2001, approximately two months after receiving the April 2001 chastising e-mail from Meintel, Plaintiff received an ECF from Meintel for failing to respond to an e-mail request from a collection agency. According to Meintel, Plaintiff failed to respond to the e-mail for three weeks. The ECF indicates that Plaintiff's action was a "Type B" offense as it constituted "unacceptable work standards" (Hendricks Dep., Ex. 20). On the ECF, Plaintiff conceded that she had not responded to this e-mail request, but indicated that she had responded to all other requests.[7]

Subsequently, on July 26, 2001, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") alleging that she was wrongfully denied the promotion to the CSR Manager position because of her race. On September 17, 2001, Baptist sent its position statement to the EEOC. On September 20, 2001, the EEOC issued Plaintiff a right-to-sue notice.

In December 2001, Plaintiff was tardy for work several days in a row. As a result, Prestage met with Plaintiff and discussed Plaintiff's tardiness and workload. Prestage encouraged Plaintiff to complete items in four to five days and to limit her personal telephone calls. In response to Prestage's concerns, Plaintiff wrote on her time sheet

> "No excuse except that I have had two children sick [sic] was trying to graduate; only sleeping about 3 hours a night. My third baby got … I will make sure to improve my promptness. I understand that my home situation is not the concern of [Baptist]. I do apologize, and will improve."

(Hendricks Dep., at 89–90, Ex. 22).

According to Plaintiff, during the first week of February 2002, Roney called her into his office and asked her if she could assist him in determining which African–American employees were not team players because he understood from reports he had received that several of the African–American employees in the office were disgruntled and unhappy with the decisions of the Caucasian managers.[8] Plaintiff refused to name any such employees and informed Roney that she would not participate in

---

6. Meintel's resignation was not effective until June 2001.

7. Both Meintel and Plaintiff signed the ECF.

8. According to the evidence before the court, there is no dispute that a conversation between Plaintiff and Roney occurred, however the content of that conversation is heavily disputed. Roney testified that Plaintiff came to his office, without any solicitation from Roney, and "expressed a desire to be a team player" (Roney Dep., at pp. 67–69). Roney also testified that he and Plaintiff merely discussed employees' attitudes and that the issue of race, or anything related to race, was never discussed (Roney Dep., at p. 65). Roney further testified that he asked Plaintiff "who [she] thought] the troublemakers [were]," but she "indicated that she was not comfortable with naming names." (*Id.*). Roney instructed her that Rodgers "needed to know that she was going to be a team player" (*Id.* at p. 69).

the "scheme." Plaintiff also told Roney that she believed that African–American employees were treated differently than the Caucasian employees, and pointed to herself as an example. Roney informed Plaintiff that if she identified the African–American troublemakers, she would not have to worry about losing her job. At the conclusion of the meeting, Roney instructed Plaintiff to speak to Rodgers because she also had concerns about the racial issues in the office. Roney informed Plaintiff that the opportunity to speak with him about identifying the "trouble makers" would remain open.

A few days later, Plaintiff followed Roney's instructions and met with Rodgers. According to Plaintiff, Rodgers also asked Plaintiff to identify the African–American employees who were "troublemakers." [9] Rodgers told Plaintiff that she believed that the moral problem in the office was caused by the African–American employees and that the Caucasian employees should not continue to be subjected to complaints or be made to feel guilty about the acts of their forefathers. Rodgers also told Plaintiff that it was "proactive people such as [Plaintiff] that they would depend on to give them information" (Hendricks Dep., at p. 149). Plaintiff informed Rodgers that she was a team player, but she again refused to identify the "troublemakers."

On March 7, 2002, Plaintiff was issued a verbal warning by Young for excessive personal calls and wasting work time (Hendricks Dep., Ex. 23). The ECF dated for March 7, 2002, indicates that on said date Plaintiff made excessive use of the telephone for personal calls from 8:30 a.m. until 9:55 a.m.[10] On the ECF, Plaintiff apologized for her behavior and indicated that she was "going through some very serious personal problems at home."

In April of 2002, Young observed Plaintiff and Wanda James (hereinafter "James"), another CBO employee, depart from the CBO without clocking out. Plaintiff and James were absent for approximately 30–35 minutes.[11] According to Young, this action is a violation of Baptist's written timekeeping policy and constitutes a "Type A" offense. Hence, on April 19, 2002, Young issued Plaintiff and James an ECF for "failure to clock in or clock out properly" (Hendricks Dep., Ex. 24). The ECF issued to Plaintiff indicates that Young gave Plaintiff a written warning for the violation.[12] Young noted that an "employee should clock out/in when leaving the building" and indicated that the consequences for further violations or failure to improve performance would be suspension. On the ECF, Plaintiff avowed that she is "aware that this is written in the handbook, [and] this will not happen again" (Id.).

Approximately six days later, on April 25, 2002, Plaintiff was issued another ECF [13] (Hendricks Dep., Ex. 25). This

---

**9.** The content of this conversation is also heavily disputed. Rodgers testified in her deposition that Plaintiff randomly entered her office and asked her if she could talk to her (Rodgers Dep., at p. 90). Rodgers responded positively and Plaintiff began to discuss how she wanted to be a team player and the various negative attitudes in the office (Id.). Plaintiff expressed that some of the other African–American female employees did not confide in her and indicated that she believed the lack of intimacy was due to her educational background and status (Id. at p. 91).

**10.** The ECF was signed by both Plaintiff and Young.

**11.** The evidence indicates that Plaintiff and James left the office to pick up lunch for themselves and other employees.

**12.** The ECF was signed by both Plaintiff and Young.

**13.** Both Plaintiff and Young signed the ECF.

ECF was issued by Rodgers and indicates that Plaintiff received a "written warning with suspension [14] for two days" for her "failure to maintain acceptable standards of work performance" (*Id.*). Rodgers noted that Plaintiff "has not responded promptly to incoming correspondence" and indicated that the consequences for further violations or failure to improve performance would be termination.[15]

One month later, on May 24, 2002, Plaintiff was issued her final ECF (Hendricks Dep., Ex. 26). This ECF was also issued by Rodgers and indicates that Plaintiff received a written warning and was terminated for her failure "to maintain accept-

---

**14.** Baptist maintains that pursuant to its progressive discipline policy, and because Plaintiff had already received a verbal and written warning for other offenses in less than two months, Plaintiff was placed on suspension for two days (Rodgers Decl., at ¶ 17).

**15.** Plaintiff also signed the ECF.

**16.** Specifically, Baptist presents evidence of the following:

> ... [P]atient Karen Simpson called the [CBO] on May 7, 2002 requesting that she be mailed a receipt for her credit card payment. These records further show that Ms. Simpson called again on May 23, 2002 when she still had not received a receipt for her payment ... The records from [CBO] also indicate that patient Pecola Rudolph called twice on May 24, 2002 claiming that she had been charged too much on her bill. The statement of services for Ms. Rudolph indicates that Ms. Rudolph was overcharged because it had two emergency room charges instead of one. [Plaintiff] had access to this screen on her computer and could have accessed it during either of the telephone calls with Ms. Rudolph.... Because Plaintiff did not make any notes about the overcharge, [Rodgers] concluded that [Plaintiff] had never even looked at the statement to see if there was anything she could do to assist the customer. As a result of the incidents involving Ms. Simpson, Ms. Rudolph, and a third patient, Walter Bunch, [Rodgers] issued Plaintiff an Em-

able standards of performance [16]" (*Id.*). The ECF indicates that Plaintiff's conduct constituted a "Type C" offense. Rodgers explains that "[a]s [Plaintiff] had already been counseled for failure to maintain acceptable standards of performance, as well as two other counselings in less than three months, the write up was classified as a C offense" (Rodgers Decl., at ¶ 21). Rodgers further elucidates "[a]s [Plaintiff] had already received a verbal warning, written counseling and suspension, [her] employment was terminated on May 24, 2002 as a result of this Employee Counseling" (*Id.*) [17]

## B. Procedural History

On June 18, 2002, Plaintiff filed this Section 1981 action [18] alleging race dis-

---

ployee Counseling Form for failure to maintain acceptable standards of performance. (Rodgers Decl., at ¶s 17–21).

**17.** Both Plaintiff and Rodgers signed the ECF.

**18.** Apparently, Plaintiff believes that she has claims pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.* (hereinafter "Title VII") before the court in this action. *See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. # 21). Nonetheless, Plaintiff has not plead any Title VII claims in her Complaint, and has not amended her Complaint to include such claims.

However, to the extent that Plaintiff has properly alleged such claims, the court finds that Plaintiff's failure to timely file suit warrants dismissal of such claims. Once an aggrieved party has received a right-to-sue notice from the EEOC, the party has ninety days to bring a civil action against the respondent named in the charge. 42 U.S.C. § 2000e–5(f)(1). The ninety-day time frame is jurisdictional, and with a few exceptions not relevant here, the ninety-day period begins to run from the date the plaintiff receives the notice. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1160 (11th Cir.1993). As aforementioned, the evidence before the court indicates that Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") on July 26, 2001 (Pl. Ex.5). On September 20, 2001, the EEOC issued Plaintiff a right to sue notice (Rodgers Dep., Ex. 14). Plaintiff however did not file this action until June 18, 2002, ten months

crimination[19] and retaliation (Doc. # 1, Compl.). Plaintiff seeks injunctive relief, back-pay (including interest), front pay, attorney's fees, lost seniority, lost benefits and compensatory and punitive damages costs (Doc. # 1, Compl). Plaintiff also demands a jury trial.

On April 21, 2003, the defendant filed a motion for summary judgment. Plaintiff filed her response to the motion on May 15, 2003 (Doc. # 21), and on May 22, 2003, Defendant filed a reply (Doc. # 23).

## II. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations supporting both.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.[20] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the

after she received her right to sue notice. With Plaintiff having set forth no ground for equitable tolling, *see Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 594 (5th Cir.1981), this court concludes that Plaintiff's Title VII claims, if any there be, are untimely.

**19.** Although Plaintiff alleged numerous racial discrimination claims as count one in her Complaint, these claims were not addressed in Plaintiff's response to the motion for summary judgment, not included in the pretrial order and, unsurprisingly, were explicitly abandoned by Plaintiff in the pretrial conference. Accordingly, the court concludes that Plaintiff has abandoned these claims. Fed.R.Civ.P. 16(e). *See also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir.2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned). *Cf. McMaster v. United States*, 177 F.3d 936, 940–41 (11th Cir.1999) (claim may be considered abandoned when district court is presented with no argument concern-

ing a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.").

**20.** The Supreme Court explained that:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted).

nonmovant either by submitting affirmative evidence negating an essential element of the nonmovant's claim or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to its claims, and on which it bears the burden of proof at trial. To satisfy this burden, the nonmovant cannot rest on its pleadings, but must, by affidavit or by other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). If the nonmoving party does not respond to a motion for summary judgment, the court may grant a motion for summary judgment in favor of the moving party, if defendant's presentation is sufficient to justify the court's conclusion. *Id.*

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also DeLong Equip. Co. v.*

*Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989).

When a court considers a motion for summary judgment, it is to refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Consideration of a motion for summary judgment does not lessen the burden on the nonmoving party, i.e., the nonmoving party still bears the burden of coming forth with sufficient evidence on each element that must be proved.[21] *Earley,* 907 F.2d at 1080. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

## IV. DISCUSSION

### A. Applicable Law

 Plaintiff alleges racial retaliation under Section 1981 which "prohibits intentional race discrimination in the making

---

21. "[I]f on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, ... [the court must] grant summary judgment [for the defendant]." *Earley,* 907 F.2d at 1080 (citations omitted). In *Earley,* the Court of Appeals further emphasized:

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

* * *

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted) (emphasis added); *accord Hudson v. Southern Ductile Casting Corp.,* 849 F.2d 1372, 1376 (11th Cir.1988). *Earley,* 907 F.2d at 1080–81.

and enforcement of public and private contracts, including employment contracts." [22] *Ferrill v. Parker Group*, 168 F.3d 468, 472 (11th Cir.1999). Although Section 1981 does not specifically reference retaliation, this court has found that Section 1981 encompasses claims of retaliation in the employment discrimination context. *Lightner v. Town of Ariton, Alabama*, 902 F.Supp. 1489, 1499 (M.D.Ala.1995).

Section 1981 requires proof of *intentional* discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (1991). Discriminatory intent can be established through either direct or circumstantial evidence. *See United States Postal Serv. Bd. of Gov. v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Where, as here, a plaintiff seeks to prove intentional discrimination through circumstantial evidence of the employer's intent, the court applies the familiar tripartite burden-shifting analysis promulgated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[23]

Under this framework, the plaintiff has the initial burden of establishing a prima-facie case of unlawful retaliation by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The purpose of the *prima facie* case is to show an adverse employment decision that resulted from a discriminatory motive. *See Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1143 (11th Cir.1983). A prima-facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] [or retaliatory] criterion." *International Broth. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

The Eleventh Circuit has established broad standards for a *prima-facie* case of retaliation. To establish a *prima facie* case of retaliation, a plaintiff must demonstrate the following: (1) that he engaged in "statutorily protected activity;" (2) that there was a "subsequent adverse employment action;" and (3) that "some causal relation exists" between the protected expression and the adverse action. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600–601 (11th Cir.1986).

Like the tripartite framework used to establish a claim of discrimination, once the plaintiff satisfies the elements of a *prima-facie* case, a presumption of retaliation is created and the burden then shifts to the employer. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913 (11th Cir. 1993). The employer can rebut the pre-

---

**22.** Specifically, Section 1981 provides, in relevant part, that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... as is enjoyed by white citizens....

\* \* \*

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**23.** The court notes that in *McDonnell Douglas*, the Supreme Court articulated the tripartite framework for analyzing claims brought under Title VII. However, the allocation of burdens and elements of a *prima facie* case are the same for employment claims stemming from Title VII and Section 1981. *See Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th Cir.1995); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994); *Howard v. BP Oil Co., Inc.*, 32 F.3d 520 (11th Cir.1994).

sumption only by articulating legitimate, non-retaliatory reasons for its adverse action. *See id.* "This intermediate burden is 'exceedingly light.'" *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997) (citation omitted). The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Burdine*, 450 U.S. at 253–255, 101 S.Ct. 1089.

█ Once the employer satisfies this burden of production, "the presumption of [retaliation] is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir.2000) (citations omitted). The establishment of a prima-facie case does not in itself entitle a plaintiff to survive a motion for summary judgment. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.1987); *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1389 (11th Cir.1983). After an employer proffers non-retaliatory reasons for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered … reasons is pretextual." *Chapman*, 229 F.3d at 1037.

*B. Plaintiff's Claim of Retaliation*

█ According to Plaintiff, she was suspended and, ultimately, terminated in retaliation for opposing racial discrimination. Specifically, Plaintiff alleges that "shortly after [she] voiced her opposition to race discrimination [in February 2002], she began being written-up, was suspended, and … terminated" (Doc. # 30, Pretrial Order).[24]

As aforementioned, to prevail on her retaliation claim, Plaintiff must show (1) that she engaged in statutorily protected activity; (2) that there was a subsequent adverse employment action; and (3) that some causal relation exists between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993). Here, Baptist contends that summary judgment is appropriate because Plaintiff has failed to establish a causal link between her February 2002 "troublemaker" discussions with Rodgers and Roney, and her April 2002 suspension or May 2002 termination.

█ "The causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir.2001) (citations omitted). The Eleventh Circuit has "plainly held that a plaintiff satisfies [the causal link] element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir.1999).

For the following reasons, the court finds that Plaintiff has satisfied the *Farley* requirements. First, it is undisputed that Rodgers placed Plaintiff on suspension and recommended her termination. It is also undisputed that Roney was advised of, and

---

24. The court notes that, although mentioned in her Complaint, Plaintiff does not assert that she was subjected to retaliation as a result of her July 2001 EEOC charge. (*See* Pretrial Order and Pl's. Br in Opp'n to Mot. for Summ., at p. 12–13).

possibly approved, these adverse employment actions before their occurrence. Further, viewing the facts in a light most favorable to Plaintiff and assuming that the "racial troublemaker" discussions occurred, the court presumes that Rodgers and Roney were aware of Plaintiff's "opposition to racial discrimination" because of her statements made in these "racial troublemaker" discussions.[25] Based on the foregoing, there is no dispute, and the court so finds, that Baptist was "aware of the protected conduct" when it suspended and, subsequently, terminated Plaintiff.

Second, it is clear in the record that Plaintiff was suspended and terminated after her "racial troublemaker" discussions with Rodgers and Roney. According to Plaintiff, these discussions occurred two months prior to her suspension and three months prior to her termination. The court finds that the two-month span between Plaintiff's protected conduct and her suspension, and three-month span between her protected conduct and termination, constitute a "close temporal proximity" sufficient to establish a causal connection between the protected activity and adverse actions. *Farley*, 197 F.3d at 1337 (holding that, where the plaintiff filed an EEOC charge on May 19, 1995 and was terminated seven weeks later, "this timeframe" was "sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case"). Accordingly, the short period of time between Plaintiff's "protected conduct" and the adverse employment actions belie any assertion by Baptist that Plaintiff failed to prove causation. The court therefore concludes that Plaintiff has sufficiently established the third element of her *prima facie* case.

■■ The burden now shifts to Baptist to articulate a legitimate, non-retaliatory reason for its action. As reasons for suspending Plaintiff, Baptist asserts that Plaintiff had been counseled in August 2000 for attendance issues, in June 2001 for failing to respond to an e-mail request from a collection agency employee, in March 2002 for wasting work time and excessive personal telephone calls, and in April 2002 for failing to clock in and out properly, and that she merely advanced to the next step in the progressive disciplinary process: suspension. Likewise, Baptist maintains that Plaintiff was terminated because her work performance did not improve and she mishandled calls related to three patients. This failure to improve and maintain acceptable performance standards led to another employee counseling, and the final step in the progressive disciplinary process: termination. In sum, Baptist avers that its decision to suspend and terminate Plaintiff had nothing to do with Plaintiff's statements in the alleged "racial troublemaker" discussions but, rather, was based solely on legitimate, non-retaliatory reasons.

■■ Baptist has met its burden to refute the inference of retaliation for Plaintiff's suspension and termination. An employer's good faith, but incorrect, belief that an employee violated a work rule can constitute a non-discriminatory reason for that employee's suspension or termination. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n. 3 (11th Cir.1999) ("An employer who fires [or disciplines] an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."). As the Eleventh Circuit has "repeatedly and emphatically held," an employer "may terminate an employee for a good or bad reason without violating federal law." *Damon*, 196 F.3d at 1361. Moreover, this court is

---

25. The court assumes, for the purpose of this motion for summary judgment, that Plaintiff's statements in the alleged "racial troublemaker" discussions are protected conduct.

not in the position to second-guess the decisions made by employers in the course of their business. *See id.* (federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). It is well-established that the federal courts should not serve as "super-personnel department[s] that reexamine[ ] an entity's business decisions." *Chapman,* 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991)).

Based on the foregoing, the court finds that Baptist satisfies its "exceedingly light" burden of producing evidence of legitimate non-retaliatory reasons for Plaintiff's suspension and termination. *Perryman,* 698 F.2d at 1142. In other words, the court finds that, based on Baptist' explanations, Baptist at the very least had a good faith belief that Plaintiff had violated company policies.

■ With Baptist articulating a non-retaliatory reason for its adverse employment actions, the burden shifts back to Plaintiff to demonstrate that these stated reasons were a pretext for intentional discrimination. *Jordan v. Wilson,* 649 F.Supp. 1038, 1054 (M.D.Ala.1986). In order to make such a demonstration, Plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered non-retaliatory reasons is pretextual. Plaintiff, however, has failed to produce *any* evidence for a reasonable factfinder to conclude that Baptist's proffered reason for her suspension and termination are pretextual. *See Chapman, supra.* ("[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered ... reasons is pretextual."). Plaintiff asserts that Rodgers and Roney

"possessed retaliatory animus" towards her because she refused to participate in their "scheme" regarding the African–American "troublemakers" (Pl's. Br in Opp'n to Mot. for Summ., at p. 14). Nonetheless, Plaintiff has not presented *any* evidence to support this assertion nor any evidence of such a "scheme." For example, Plaintiff has presented no evidence that Rodgers and Roney had similar "racial troublemaker" discussions with other African–American employees in furtherance of this "scheme" or that other African–American employees were aware of Rodgers and Roney's quest for "troublemakers." Instead, Plaintiff has merely presented unsubstantiated assertions which, alone, are not enough to withstand a motion for summary judgment. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

■ Moreover, Plaintiff has not come forward with any evidence that questions the veracity of Baptist's reasons or reveals any discriminatory animus on the part of Baptist. *See Holifield,* 115 F.3d at 1565. A plaintiff may establish pretext by undermining the credibility of the defendant's proffered explanations. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997). Instead of relying on conclusory allegations of retaliation, the plaintiff must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Id.* In this case, Plaintiff simply challenges the wisdom of Baptist's decision to suspend or terminate her and has not presented the court with any evidence that Baptist's stated reasons are unworthy of belief. As a result, Plaintiff has failed to produce sufficient evidence for a reasonable factfinder to conclude that Baptist's stated

reasons are pretextual. Accordingly, the court concludes that summary judgment is warranted on this claim.[26]

## V. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the defendant's motion for summary judgment (Doc. #16) is GRANTED.

The Clerk of the Court is DIRECTED to remove the above-styled case from the trial docket.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this 21st day of August, 2003.

### *FINAL JUDGMENT*

In accordance with the prior proceedings, opinions, and orders of the Court, it is the ORDER, JUDGMENT, and DECREE of the Court that:

(1) Judgment be and is hereby entered in favor of the Defendant, Baptist Health Services, and against the Plaintiff, Tracy Hendricks.

(2) Costs are taxed against Plaintiff, Tracy Hendricks, for which execution may issue.

The Clerk of the Court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

DONE this 21st day of August, 2003.

26. As the resolution of this issue is dispositive, the court pretermits discussion of Baptist's remaining contentions.